UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEONARD WARE,

                    Petitioner,                      Case Number 17-11356
                                                      Hon. David M. Lawson

v.

SHAWN BREWER,

                    Respondent.
_____/

## OPINION AND ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Leonard Ware, serving a lengthy prison term for murder and firearms offenses, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging those convictions. He returned to state court to exhaust additional claims, and now presents an amended petition. He argues that his trial was unfair for several reasons and his lawyer performed in a constitutionally deficient way. Because the state courts' rejection of these claims was consistent with federal law as determined by the Supreme Court, the petition will be denied.

I.

In 2012, Ware shot and killed a co-worker not far from their manufacturing plant in Ypsilanti, Michigan. He was charged with open murder and various firearms offenses. A jury convicted him of second-degree murder, carrying a concealed weapon, possession of firearm as a convicted felon, and commission of a felony with a firearm. He was sentenced to an indeterminate prison term of at least 25 years and up to 50 years. In its opinion on direct review of the convictions, the Michigan Court of Appeals summarized the facts of the case as follows:

- 1 -

Defendant shot and killed a coworker not far from the manufacturing plant where they worked following a day of bickering and altercations between the two at the plant, including an incident in which the victim slapped defendant in the face, knocking off his safety glasses and dislodging his earplugs. The two ultimately agreed to engage in a fight after work, with the victim suggesting to defendant, through words and gestures, that defendant should bring his gun to the fight. Defendant and the victim walked away from the plant at the end of the workday and eventually squared up to fight in the middle of a nearby street. According to defendant, the victim, who purportedly was hot-headed and had bragged about being on parole for nearly killing a person, then turned "like he was reaching for something." Defendant, who had earlier retrieved a firearm from his truck, testified that he panicked, drew his gun, and began shooting because he was fearful that the victim was going to kill him. A witness testified to hearing gunshots and then observing the victim collapse, defendant standing over the victim, and defendant firing several more times into the victim's motionless body before running away. Defendant conceded that he did not see a weapon in the victim's hand. The county medical examiner testified that the victim sustained ten gunshot wounds, and the medical examiner described each of the wounds, which testimony was supplemented by the introduction of autopsy photographs. Defendant argued self-defense, and the trial court gave the jury extensive instructions on self-defense, directing the jurors that the prosecution had the burden to prove beyond a reasonable doubt that defendant did not act in self-defense. With respect to a count of open murder, the jury was instructed on first-degree murder, second degree murder, and voluntary manslaughter. The jury convicted defendant of second-degree murder, as well as the various weapons charges.

*People v. Ware*, 2015 WL 3974526, at *1 (Mich. Ct. App. June 30, 2015) (citations omitted).

Following his conviction of the above-described offenses, the trial court sentenced the petitioner to 23 to 50 years for murder, two to five years for carrying a concealed weapon and possessing a firearm as a convicted felon, and a consecutive term of two years for possessing a firearm during the commission of a felony. His convictions were affirmed by the court of appeals and the Michigan Supreme Court denied leave to appeal. *Ware*, 2015 WL 3974526; *People v. Ware*, 499 Mich. 857, 873 N.W.2d 578 (Mich. 2016)

The petitioner then filed his habeas corpus petition, alleging that his trial was unfair because the trial court admitted gruesome autopsy photographs in evidence, he was shackled

- 2 -

during trial, and a police officer sat close to him when he was testifying on his own behalf.  He also argued that his trial lawyer performed deficiently.  Those claims were raised in the state court. But Ware sought to raise some new claims and asked to return to state court to present them there first.  The Court granted his motion to stay the case for that purpose.  Ware presented additional instances of ineffective assistance of counsel, but the trial court denied relief and both Michigan appellate courts denied of Ware's applications for leave to appeal.

Ware returned to this Court, moved to reopen the present case, and filed an amended petition.  He asserts all the claims he presented to the state courts on direct appeal and in his post-conviction motion.  The respondent filed an answer asserting among other things, that the claims do not merit relief.

## II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review.  Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)).  The AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be "given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).

A.

For his first argument, the petitioner contends that the trial court erred by admitting gruesome autopsy photos of the victim.  He states that his trial attorney was willing to stipulate to the number, location, and nature of the victim's gunshot wounds, and the jury was provided information regarding the wounds by the medical examiner, so it was therefore unnecessary and gratuitous to publish the photos to the jury, denying his right to a fair trial.  The Michigan Court of Appeals rejected that claim, holding that the photographs were admitted properly under state evidence law.  The court reasoned that the photos were relevant to rebut the petitioner's claim of

- 4 -

self-defense, as they "showed the great number of gunshot wounds, depicted wounds to the victim's backside, side, and wrists, and revealed a bullet wound to the victim's cheek severing his carotid artery, which appeared to have resulted from defendant discharging his gun while standing directly over the victim." *Ware*, 2015 WL 3974526, at *1-2. The court determined that any unfair prejudice generated by the "inherent gruesomeness" of the photos did not substantially outweigh their evidentiary value of corroborating the medical examiner's testimony, and the prosecutor was not bound to accept the petitioner's proposed stipulation in this instance. *Ibid.*

State evidentiary rulings will not trigger federal due process concerns unless the evidence admitted (or excluded) renders the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The Supreme Court has stated that for evidence that is so unfairly prejudicial "that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). "Unfair prejudice" means that the evidence would be used by the jury for an improper purpose, such as declaring guilt on a ground different from proof specific to the offense charged. *Old Chief v. United States*, 519 U.S. 172, 180 (1977).

The state courts did not address any question of unfairness of the photographs, fundamental or otherwise, but they did determine that the evidence has a proper purpose. And the rejection of the petitioner's objection, even in light of his offer to stipulate to the location of the wounds and the alternate proof supplied by the medical examiner, is consistent with "the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Id.* at 189. A prosecutor must not only prove the elements of a crime but also must manage jurors' expectations. As for reliance solely on the medical examiner's testimony, one must

remember that "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." *Ibid.* And as to the proposed stipulation, "[a] convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best." *Ibid.*

The admission at trial of gruesome photographs of a murder victim is not fundamentally unfair where, as here, there is some legitimate evidentiary purpose for the photographs' admission. *See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (upholding the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso because the photographs were highly probative of the prosecutor's claim that the petitioner beat the victim severely and meticulously dissected her body); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) (finding acceptable the admission of multiple photographs of the victim used by the coroner to illustrate the nature of the encounter preceding the victim's death); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that "although the photographs were gruesome, they were highly probative").

Here, the petitioner asserted that he shot the victim in self-defense. The prosecutor sought to rebut that defense with proof that the petitioner shot the victim ten times and continued to shoot him even when he was no longer a threat. The photos supported that assertion, tending to show that after the first few shots, the petitioner continued to shoot the victim as he lay helplessly on the ground. Photographs of the victim's wounds, even if cumulative to the testimony of the medical examiner, served a legitimate evidentiary purpose of rebutting the petitioner's claim of self-defense. The state court's rulings sanctioning the admission of the photos did not involve an

unreasonable application of, or contravene, established Supreme Court law. *Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012) (state court's determination that petitioner's right to a fair trial was not violated by admission of 18 gruesome autopsy photographs of his victims that were shown to jurors on a large projector screen during trial for aggravated murder not contrary to clearly established Supreme Court precedent).

B.

The petitioner next argues that his trial was fundamentally unfair because he was placed in shackles throughout the whole proceeding.  He says that the Washtenaw Circuit Court routinely requires criminal defendants to be shackled without making the constitutionally required case-specific determination, and none was made here.

The Michigan Court of Appeals criticized the trial court's failure to make the requisite findings and noted that there was no evidence justifying shackling in the record.  But the court held that that abuse of discretion was harmless because "nothing in the record indicat[ed] that any jurors saw the shackles worn by defendant, and the shackles were removed, outside the presence of the jury, for purposes of defendant taking the stand to testify on his own behalf."  *Ware*, 2015 WL 3974526, at *3.  In addition, "jurors could not see the leg restraints while defendant sat at the defense table," and "the trial court allowed everyone at the defense and prosecution tables, except for the lead attorneys, to remain seated during introductions, and allowed everyone, including the attorneys, to remain seated when the jury entered."  *Ibid.*

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest

- 7 -

specific to a particular trial." *Id.* at 629. *Deck*'s holding, however, "concerned only visible restraints at trial." *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008). The petitioner has identified nothing in the record to counter the state appellate court's finding that his leg restraints were not visible to the jurors at his trial. And the record contains a contrary finding.

The trial court made no case-specific findings and raised the issue of shackling as a *fait accompli*, only asking the parties to determine whether the leg restraints could be seen from various angles in the courtroom. Defense counsel requested that shackles not be used. The prosecutor agreed and stated his preference that the petitioner "would not be in those." The court did not entertain these requests, and instead it stated that the shackles could not be viewed by the jury if the petitioner kept his feet together under the table.

But despite that clear error, the trial cannot be viewed as fundamentally unfair when there is no evidence that the jurors were aware of the shackling. *See Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009) (holding that a claim based on *Deck* "rises or falls on the question of whether the [restraint] was visible to the jury"). Where a restraint is not visible, there is no due process violation. *Leonard v. Warden*, 846 F.3d 832, 842 (6th Cir. 2017).

The petitioner did not assert in the state courts — and he does not assert here — that the jury actually saw his leg restraints. The factual finding by the state court that the restraints were not visible is binding on this Court unless the petitioner can show that it is clearly erroneous. *Earhart*, 589 F.3d at 349 (citing 28 U.S.C. § 2254(e)(1)). No Supreme Court precedent suggests that restraints that are *not* visible to the jury violate due process. The state appellate court's determination of harmlessness faithfully applied federal law as established by the Supreme Court. A constitutional error that implicates trial procedures is considered harmless if it did not have a

"substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that the *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit).  The petitioner is not entitled to relief on this claim.

## C.

The petitioner's next claim is similar to the previous one: it was fundamentally unfair, he says, to place a fully armed police officer immediately behind him throughout trial proceedings. He asserts that the presence of the officer unmistakably communicated to the jury that the petitioner was a dangerous individual, undermining the presumption of innocence.

The Michigan Court of Appeals rejected this claim on two bases: there was no prejudice, and the state had an interest in this security measure.  There was no prejudice, the court held, because the jury did not find the petitioner guilty of first-degree, premeditated murder, despite nearly undisputed evidence that he shot "the victim ten times, including in the back and side and while standing directly over the victim as he lay motionless." *Ware*, 2015 WL 3974526, at *4. And the court determined that "there clearly existed an essential state interest in so deploying the officer, i.e., security for those in the courtroom, including the jurors." *Id.* at *5.  The court noted that the petitioner is 6'4" and 280 pounds with a felony record and was facing the potential of life imprisonment after indisputably having shot a person ten times at close range, and he was not shackled while on the stand." *Ibid.*

That decision did not misapply or contravene Supreme Court precedent.  In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court confirmed that, "[c]entral to the right to a fair trial,

guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'"  *Id.* at 567 (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).  But in that case, the Court held that the presence of four state troopers in the front row of the spectator section of a courtroom during a criminal trial was not "so inherently prejudicial that [defendant] was thereby denied his constitutional right to a fair trial." *Id.* at 570. The Court did not believe that the show of force tended to "brand" the defendant in the eyes of the jury "'with an unmistakable mark of guilt.'"  *Id*. at 571 (quoting *Estelle v. Williams*, 425 U.S. 501 (1976)).  Nor did it tend to overemphasize the reality that "jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance."  *Id.* at 567.

If four uniformed officers in the front row of a courtroom during a criminal trial did not offend due process, it is hard to say that a single policeman in close proximity to the testifying defendant would contravene Supreme Court precedent.  The Court has "never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct."  *Ibid.*  Although some trial procedures in certain circumstances can cross the line of fairness, *e.g.*, *Deck v. Missouri*, 544 U.S. at 629 (making the defendant wear shackles that are visible to the jury); *Estelle v. Williams,* 425 U.S. 501, 503-04 (1976) (forcing a defendant to wear prison clothes when appearing before the jury); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (binding and gagging the defendant during trial), the security procedure used here fell well within the permissible boundary.

- 10 -

D.

The petitioner's remaining claims address the performance of his trial attorney, which he says was constitutionally deficient in several respects.  The warden asserts that the complaints that the petitioner did not raise until his post-conviction motion are procedurally barred from review. But because the trial court's alternative merits-based rejection of the claims was reasonable, the court need not address the more complicated issues presented by the respondent's procedural defense.  *See Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel.  An ineffective assistance of counsel claim has two components.  A petitioner must show that counsel's performance was deficient, and that deficiency must have prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance meets the first element when "counsel's representation [falls] below an objective standard of reasonableness."  *Id*. at 688.  The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.

The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Success on ineffective assistance of counsel claims is relatively rare, because the *Strickland* standard is "'difficult to meet.'" *White*, 572 U.S. at 419 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013)). And under AEDPA, obtaining relief under *Strickland* is even more difficult because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). This doubly-deferential standard requires the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

1.

The petitioner asserts that his attorney performed deficiently when he did not object to a jury instruction that directed the jury to consider the principal charge first and only consider the lesser charges after it determined whether he was guilty or not guilty of the greater charge. He also asserts that the verdict form did not provide the jury with the option of checking a single box indicating that the petitioner was not guilty of all offenses; instead it had separate entries for each charge and lesser-included offense with its respective not-guilty checkbox.

- 12 -

The Michigan Court of Appeals rejected these claims, finding that the petitioner did not demonstrate that he was prejudiced by any deficiencies in the jury instructions or the verdict form. The court noted that the trial judge did not follow the conventional practice when instructing on lesser included offenses, which is prescribed by the state's pattern jury instructions. And it implied that an objection by defense counsel on that ground would have been well taken. *Ware*, 2015 WL 3974526, at *6 ("It is the failure to read [the pattern jury instruction] in conjunction with the problematic format of the verdict form, which raises real concerns . . . ."). But, describing the petitioner's main complaint as a concern that the instructions and verdict form discouraged the jury from considering the lesser offense of voluntary manslaughter, the court held that there was no reasonable probability of a different result even if counsel would have objected successfully. *Id.* at *7. The court reasoned that

> in the jury's examination of second-degree murder, it necessarily had to tackle the question whether the prosecution had proven beyond a reasonable doubt "that the killing was not justified, excused, or done under circumstances that reduce[d] it to a lesser crime." This examination would have encompassed contemplation of self-defense and of voluntary manslaughter principles such as emotional excitement and heat of passion, upon which the jury was instructed. And indeed[,] the jurors presented the trial court with a request for a dictionary so that they could obtain a definition of the term "passion." Clearly, the jury was swayed that the prosecutor had established beyond a reasonable doubt that the shooting was not justified, excused, nor [*sic*] done under circumstances that would have reduced the crime to voluntary manslaughter. Additionally, defendant presented the defense of self-defense and did not argue in favor of heat of passion or extreme emotional excitement, which pertain to voluntary manslaughter.

*Ibid.* That reasoning led the court to conclude that even if the jury were instructed properly and given a correct verdict form, it was unlikely that "the jury would have acquitted defendant of second-degree murder and settled on voluntary manslaughter or a complete acquittal." *Ibid.*

Fair-minded jurists might disagree with that prejudice assessment.  But that is not enough to support issuance of the writ.  *Harrington*, 562 U.S. at 103.  The state court's conclusion that a manslaughter verdict was a remote possibility, even with proper instructions that would have resulted from a defense objection, is justified by the record.  To show prejudice, the petitioner was required to demonstrate a reasonable probability that the combination of the jury instructions and verdict form led the jury erroneously to convict him of second-degree murder instead of the lesser offense of manslaughter because they believed they needed to agree unanimously that the petitioner was not guilty of second-degree murder before considering the manslaughter charge.  Implicit in the petitioner's argument is the idea that if it had been correctly instructed, the jury might have considered the manslaughter charge (and found him guilty of it) before deciding whether they could agree on a verdict on the greater charges.

The court of appeals found that result improbable in light of the petitioner's self-defense theory and the absence of any evidence indicating a heat-of-passion homicide.  That conclusion is reasonably supported by the record.

Under Michigan law, second-degree murder can be reduced to voluntary manslaughter if the element of malice (i.e., the intent to kill, to commit great bodily harm, or to create a very high risk of death or great bodily harm) "is negated by the presence of provocation and heat of passion." *People v. Mendoza*, 468 Mich. 527, 540, 664 N.W.2d 685, 692 (2003).  The petitioner's jury was instructed accordingly in the language of the pattern instruction.  *See* Mich. Crim. Jury Instr. 17.4.  The petitioner did not present evidence that fit such a theory.  He testified in his own defense, but he did not contend that he shot the victim because he was disturbed by emotional excitement that caused him to react based on impulse or passion instead of judgment.  Rather, he testified that he

- 14 -

shot the victim because he thought he was reaching for a gun.  The petitioner testified that the victim told him he had once shot a guy, and he bragged to the petitioner about "the violent stuff he had did [sic] in his life."  The petitioner said that he believed that the victim had previously threatened to kill another co-worker.  After a brief physical confrontation at work, the victim warned the petitioner that he better "bring his thing," (his gun) with him when they met to fight after work.

The petitioner testified that he believed the two would have a fist fight after work, and he waited for the victim to meet him down the street from their workplace.  As the two walked down the street to find an area to fight, the petitioner described his thought as "I'm going to fight this guy."  Once the two were out of view of their workplace, the two men squared up to fight.  The petitioner testified that the victim then "turned like he was reaching for something."  He testified, "I thought he was going to kill me.  I pulled out and started firing."  The petitioner testified that he was in fear.  On cross-examination, he testified that "all I saw is him reach . . . I panicked."  He shot the victim because the petitioner "believed he was a threat," and he "feared for his life."

Based on this evidence, it was reasonable for the state appellate court to conclude that there was no probability that the jury would have convicted the petitioner of manslaughter had the instructions allowed them to consider that offense before arriving at a verdict on the greater offenses. The facts of the case were suggestive of acquittal on self-defense grounds if the petitioner's testimony was believed.  But the verdict — guilty of second-degree murder — indicates that the jury did not believe his testimony that he was in fear for his life when he shot the victim.  And other than the petitioner's rejected testimony that he feared for his life, there was no evidentiary basis for finding that he shot the victim out of emotional excitement or in the heat of

- 15 -

passion.  Moreover, contrary to the petitioner's argument, the fact that the jury sent a note to the court asking for a definition of "passion" indicates that they did consider the lesser offense of manslaughter despite the wording of the instructions and the verdict form.

The resolution of this claim at least falls within the range of fair-minded disagreement, and therefore the petitioner has failed to demonstrate entitlement to relief. *Richter*, 562 U.S. at 103.

2.

Bundled in the petitioner's seventh claim are five distinct allegations of deficient performance by his trial attorney. The state trial court briefly addressed the merits of each claim in its order denying the petitioner's motion for relief from judgment.

First, the petitioner asserts that his lawyer was ineffective because he did not move for a mistrial due to the conduct of two jurors.  Juror No. 12 called the court on the morning of the second day of trial complaining that he could not afford transportation to the courthouse.  The court indicated that the juror was "quite angry," but he appeared for trial anyway.  Later, before deliberations, rather than randomly dismiss two of the fourteen jurors, the court excused Juror No. 12 based on his expressed hardships.  There was no objection.

Juror No. 1 informed the court that she learned after jury selection that one of the eyewitnesses scheduled to testify was her good friend's mother.  A separate record was made as to Juror No. 1's ability to be impartial following her disclosure.  The juror initially testified that she believed she could be impartial despite her friend's mom testifying, but she admitted later that she believed the witness to be a credible person.  The prosecutor indicated he would not object if the court struck the juror.  Defense counsel stated that had he known of the relationship during

- 16 -

jury selection he would have challenged her for cause, and failing that, he would have used a peremptory challenge on her.  The court excused Juror No. 1.

The petitioner asserts that the trial court's act of dismissing the two jurors during trial was an insufficient remedy and a mistrial was warranted. The trial court rejected the claim after deciding that the chosen procedure amounted to a proper exercise of its discretion.  The court also rejected the petitioner's speculation that Juror No. 1 "tainted the entire jury by deliberating throughout the entire trial contrary to the court's instructions."  ECF No. 12-2, PageID.1136.  The court had instructed the jury "not to speak to anyone, including each other, about the case until deliberation" and found no evidence that any juror disobeyed that instruction.  *Ibid.*  Juror No. 1 was dismissed before the jury deliberated.

The trial judge did not specify whether this aspect of the ineffective-assistance-of-counsel claim was rejected for failure of the deficient performance or prejudice component.  However, the record supports both grounds.

A trial court is in the best position to determine the nature and extent of any alleged juror misconduct and to fashion an appropriate remedy.  *United States v. Gaitan-Acevedo*, 148 F.3d 577, 590 (6th Cir. 1998).  When the conduct of a juror does not affect the other empaneled jurors, it is proper for the trial court to dismiss the compromised juror and deny a motion for mistrial.  *United States v. Davis*, 407 F. App'x. 32, 37 (6th Cir.  2011).  The petitioner's attorney, therefore, did not furnish substandard performance by not moving for a mistrial.  And even if he had, there is no evidence that either incident was communicated to the remaining jurors.  Also, as the trial court observed, there is no suggestion that the jurors disregarded the instruction not to discuss the case prior to deliberations.

Nor was a hearing required to determine whether the other jurors were affected.  To be entitled to such a hearing, a defendant "must do more than simply raise the possibility of bias." *United States v. Vining*, 224 F. App'x. 487, 492 (6th Cir. 2007) (quotation marks omitted).  Rather, the defendant "must make a colorable claim of extraneous influence," that is, "one derived from specific knowledge about [the potential source of bias]."  *Id*. at 492-93.  Nothing in the record indicates that Juror No. 12's frustrations about the cost of jury duty impacted the other jurors, nor does it indicate that Juror No. 1 communicated to the other jurors that she knew and trusted one of the witnesses.

The trial court's rejection of the ineffective-assistance-of-counsel claim properly applied governing Supreme Court precedent.

3.

The petitioner next asserts that his counsel was ineffective for allowing him to waive his personal appearance during a critical stage of the proceedings.  On the first morning of trial, while the petitioner was changing his clothes outside of the courtroom, his attorney presented argument regarding the admissibility of the autopsy photos and the jury instructions.  The petitioner asserts that his attorney should not have allowed him to waive his right to be present for this discussion.

There is no question that the petitioner actually waived his right to be present for that argument.  On the morning of jury selection, the petitioner appeared at court from jail in a tee shirt. There had been a mix-up with the delivery of his clothes, and he was allowed to change.  Defense counsel stated that he was prepared to address the issue of the admissibility of autopsy photos, as he had discussed the matter with the petitioner on the previous evening, and the matter could be addressed while the petitioner changed his clothes if he would waive his right to be present.  The

- 18 -

court stated, "Okay. Mr. Ware, you understand you have a right to be here, we can wait?"  The petitioner stated his understanding and answered that it was "fine" to proceed without him.

On the post-conviction motion, the trial court simply recited these facts and found "no error here," without any further discussion.  ECF No. 12-2, PageID.1136.  But that bare conclusion does not contravene or unreasonably apply federal law.

A defendant in a criminal case has a constitutional right to be present at all critical stages of the trial.  *Rushen v. Spain*, 464 U.S. 114, 117 (1983). The right to be present is not absolute, however, and it is not guaranteed "when presence would be useless, or the benefit but a shadow." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  A defendant's presence at a hearing is "largely a matter of form" when a defendant's lawyer is present at proceedings which raise largely legal issues.  *Cathron v. Jones*, 190 F. Supp. 2d 990, 1001-02 (E.D. Mich. 2002).

The petitioner has not shown that his attorney performed deficiently by allowing him to waive his right to be present while the two legal issues were discussed.  He has not indicated why it was necessary for him to be present during this strictly legal argument, or how his presence would have made any difference to the outcome of the case.  *See United States v. Osterbrock*, 891 F.2d 1216, 1219-1220 (6th Cir. 1989) (finding that the petitioner failed to prove that his counsel was deficient by not objecting to the reading of a witness's testimony to the jury by the court reporter in his and his counsel's absence, or that the failure to object was prejudicial).  This allegation was reasonably rejected by the trial court.

4.

The petitioner argues that his counsel failed to request a "bill of particulars."  He asserts that his counsel should have forced the prosecutor to specify the theory he would be proceeding under at trial.  The trial court rejected this claim, again not specifying whether its rejection was on the basis of proper performance by defense counsel of lack of prejudice.  ECF No. 12-2, PageID.1136.  Either way, the decision was reasonable.

A Bill of Particulars may be necessary in some cases to afford the defendant adequate notice of the charge he is facing.  That is not the case here, where the petitioner was charged with open murder (which includes both first- and second-degree murder) for having shot a man ten times.  The evidence was laid out at a preliminary examination, where a magistrate found probable cause to believe that the petitioner committed the charged crimes.  *See* Mich. Ct. R. 6.112(E); *People v. McBride*, 204 Mich. App. 678, 681, 516 N.W.2d 148, 150 (1994). The preliminary examination testimony also informed the petitioner of "the nature and the elements of the charges against him," and under state law, that obviated the need for a Bill of Particulars.  *People v. Jones*, 75 Mich. App. 261, 270 (1977), 254 N.W.2d 863, 867.  Counsel was not ineffective by not demanding a Bill of Particulars, and the trial court reasonably rejected the claim.

5.

The petitioner claims that his counsel failed to investigate whether prosecution witness Todd Von Schulze committed perjury and failed to object to the prosecutor's failure to correct his false testimony.  The trial court denied the claim by noting that there was no evidence of perjury and therefore no due process violation resulted from the prosecution presenting his testimony. ECF No. 12-2, PageID.1136-37.

At the preliminary examination, Von Schulze testified that his bedroom window faced Grove Street, where the shooting occurred.  He was sitting on his couch, and through the window he saw a man running down the street.  The man put up his hands and yelled, "no, no, no."  Von Schulze testified that the man was about 20 to 30 feet away from him when he saw this.  Von Schulze then saw the shooter appear and shoot the victim twice.  The victim fell, and the shooter then "stood over him and emptied his pistol into him."  On cross-examination, defense counsel asked Von Schulze if he told police that he had been sitting in his living room when the shooting occurred, and he answered, "I did not."  He testified that his blinds were open, but the single-paned window was closed.  He explained that there was about six to eight feet of grass between his window and a fence, a small patch of grass between the fence and the sidewalk, and after that was the street where the shooting occurred.  Von Schulze admitted that he previously estimated the distance to police as being thirty yards.

At trial, Von Schulze testified to essentially the same facts.  He again testified that he was in his bedroom when he saw the shooting, and that he was about thirty or forty feet away from the location.  On cross-examination, Von Schulze testified that his window was partially open; he had testified at the preliminary examination that it was closed.  He testified at trial that he did not recall telling the 9-1-1 operator that he was one-hundred yards away, or previously saying that he was thirty yards away.  Von Schulze recalled saying he was thirty feet away.

The record shows that Von Schulze testified inconsistently about the distance he was seated from the shooting, ranging from twenty feet to one hundred yards. Another inconsistency was whether his bedroom window was open or closed. Defense counsel was aware of the inconsistencies.  He brought them out on cross-examination to attack Von Schulze's credibility

- 21 -

and to attack the reliability of his observations.  Prudent counsel need not also have raised a false-evidence claim at trial.  Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony by the prosecutor. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).  Additionally, the fact that a witness contradicts himself or changes his or her story does not establish perjury. *Malcum v. Burt*, 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003) (citing *Monroe v. Smith*, 197 F. Supp. 2d 753, 762 (E.D. Mich. 2001)).  Defense counsel was not ineffective for the manner in which he used Von Schulze's inconsistent statements against him.  The trial court reasonably rejected the claim.

6.

Next, the petitioner asserts that his attorney responded ineffectively to the manner in which the trial court dealt with the jury note asking for a dictionary for a definition of "passion."  On the second day of deliberations, the jury sent a note to the court asking for a dictionary.  When the jury was brought back to the courtroom, the foreman stated, "We wanted to find out the definition of the word 'passion' and what falls under that category, mainly."  After a bench conference, the court instructed the jury, "Instead of leaving this up to a dictionary, we're going to leave it up to you to determine what the word means, based on your everyday experience, common knowledge, and background.  Okay.  So that's something that you'll need to determine yourselves."  Neither side objected to this supplemental instruction.

The trial court rejected the petitioner's argument that his attorney should have objected, reasoning that "[g]ranting that request, however, would have been an error because a jury should not use a dictionary to define a legal term."  ECF No. 12-2, PageID.1137.  Presumably, the court concluded that defense counsel did not perform deficiently by not objecting.

- 22 -

The trial court was correct in its observation: a dictionary generally has no place in a jury room during deliberations.

> Provision of a dictionary to a jury by a judge after the close of the evidence and the instructions — except perhaps in extraordinary circumstances and after thorough discussion with counsel on the record — should not happen.  At best, an extrinsic resource of this sort is superfluous.  Proper definitions of key terms should be included in the instructions themselves, as they were here.  At worst, dictionary definitions will conflict with definitions set forth in the instructions and create confusion, or even mislead a jury.

*United States v. Pagan-Romero*, 894 F.3d 441, 446 (1st Cir. 2018).

The trial court used Michigan's pattern jury instructions verbatim to define the required mental state for voluntary manslaughter. It reads:

> First, when the defendant acted, his thinking must be disturbed by emotional excitement to the point that a reasonable person might have acted on impulse, without thinking twice, from passion instead of judgment. This emotional excitement must have been the result of something that would cause a reasonable person to act rashly or on impulse. The law does not say what things are enough to do this. That is for you to decide.

ECF No. 6-8, PageID.486.; Mich. Crim. Jury Instr. 16.9.  Under Michigan law, the emotions that constitute "passion" sufficient to reduce a crime from murder to manslaughter are not defined with anymore specificity than that contained in the pattern instruction, and it is an issue left for the jury to decide as a question of fact.  *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998) (citing *People v. Townes*, 391 Mich. 578, 590, 218 N.W.2d 136, 140 (1974)).  As the trial court noted, further defining the term "passion" by reference to the dictionary definition might have led the jury to erroneously rely on the dictionary definition as a statement of law.

An objection would have been fruitless, and the failure to object did not constitute deficient performance.

- 23 -

7.

As a final matter, the petitioner asserts that his appellate counsel was ineffective because he did not assert his post-conviction claims on direct appeal.  Because the Court has determined that those claims lack merit, appellate counsel was not ineffective by failing to raise them on direct review.  *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d).  The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  November 23, 2020

- 24 -